FILED'08 DEC 01 15:37 USDC-ORP

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

CAROLANN M. NEES,                                    CV. 08-6012-AC

                        Plaintiff,                   FINDINGS AND
                                                     RECOMMENDATION

            v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                        Defendant.

_____

ACOSTA, Magistrate Judge:

        Plaintiff Carolann M. Nees ("Nees") filed this action under section 205(g) of the Social

Security Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the

Commissioner of Social Security (the "Commissioner") who denied her application for social

security disability insurance benefits ("Benefits"). For the reasons stated below, the court finds that

the decision of the Commissioner should be affirmed.

## PROCEDURE

On December 6, 2004, Nees filed an application for Benefits alleging an onset date of January 1, 2001, which was later amended to July 10, 2004. The application was denied initially, on reconsideration, and by the Administrative Law Judge (the "ALJ") after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

## FACTS

Nees is currently 47 years old. She completed the eighth grade and is one math class from obtaining her GED. Her past relevant work experience includes construction worker, flagger, and truck driver. She has not been involved in a successful work attempt since November 30, 2000. Nees alleges disability based on cervical spondylosis with degenerative disc disease of the cervical sac; annular tear of the intravertebral disc in the cervical spine; and variants of migraine headaches. Nees last met the insured status requirements entitling her to Benefits on December 31, 2005.

### Testimony

Nees completed the eighth grade and is one math test short of a GED. (Tr. 424.)[1] She has attended Lane Community College since 2001. (Tr. 409.) She originally attempted to take a full course load (twelve to fifteen credits) but was having trouble falling asleep in class and attending every class. (Tr. 410.) She has since attended on a part-time basis (seven to nine credits) and has been able to get better grades — she has a "B" average. (Tr. 410-11) One semester, Nees received an "F" in both anatomy and physiology as a result of her medical problems. She was unable to attend the classes for a period of time after it was too late to drop the classes. (Tr. 411.) Nees receives accommodations from the school, such as help with testing and note taking and appropriate

---

[1] "Tr." refers to the official transcript of the administrative record. (Docket #12.)

chairs to sit in. (Tr. 411.) Nees testified that she has taken virtually every major class offered at the community college but has not completed any programs. However, because she has completed 150 credit hours, she is no longer qualified to attend school. (Tr. 412.)  Nees was interested in the medical office assistant program but was not able to enroll in the program because she had not received her GED. (Tr. 412-13.)

Nees's primary care physician is Dr. Ames, who she sees for colds, flus, infections and the like. She sees him sometimes twice a month. (Tr. 413.) Dr. Klos is her treating physician for pain management. She sees him once a month. He has prescribed Oxycodone and Methadone for pain, Naproxyn for inflammation, and marijuana for nausea. (Tr. 413-15.) As a result of her regular intake of these medications, Nees suffers from daily constipation and weekly nausea with vomiting. She has remained sick for up to three days and has been hospitalized on numerous occasions. (Tr. 414.)

Nees testified that about 70% of her pain is controlled with medication. She continues to have pain, numbness and weakness in her arms and headaches in the back of her head virtually all of the time. (Tr. 415.) At least once a week she needs to sleep for an hour or two to make her headaches go away. (Tr. 416.) She has constant low back pain that has recently moved down her leg and into her hip on the left side. (Tr. 416-17.)

Repetitive arm movements, such as washing dishes and vacuuming, intensify the pain in her arms and upper body. (Tr. 416.) Nees is not able to do all of her household chores so she has her daughter come over to help her finish up by vacuuming and doing dishes and the deep cleaning. (Tr. 419.) She is able to prepare all of her own meals and go shopping, including carrying the groceries, if one of her children will drive her. She does not drive when she is on medication. (Tr. 420.) If

she does yard work or anything major with her body, she will end up paying for a couple of days. (Tr. 417.) She spends about an hour a week planting flowers and vegetables and harvesting them. She is able to handle that kind of work when she is really energetic and knows she is going to be a home for a day or two. (Tr. 417-18.) She arranges for someone else to mow her lawn after she tries to mow it herself. (Tr. 419.)

Nees is able to carry a gallon of milk and, on an average day, can stand a good 20 or 30 minutes before experiencing major pain and sit for half an hour to an hour without moving or shifting. (Tr. 420-21.) She walks between classes at school, but does not know how far that is, and she is occasionally late to a class when she has to walk clear across campus. (Tr. 421.) On her bad days, which occur at least two days a week, she curls up on her couch and does not move much at all. (Tr. 421.) On her good days, she lays down for about an hour a day. (Tr. 422.)

During the summer, Nees spends a lot of time camping at the river – four or five times a summer. She sits on the rocks and plays in the river. She does a lot more sitting on the river than playing in the water because of her headaches and neck and leg pain. (Tr. 422.) She also goes hunting for a week in November. She generally stays at the camp and makes dinner but occasionally she will ride out in the vehicle with the hunters. She no longer skis, snowmobiles or rides horses like she used to because it hurts too bad. (Tr. 423.)

### Medical Evidence

Nees's primary complaints are back and neck pain resulting from a motor vehicle accident which occurred on October 19, 1997. Since the accident, Nees has been regularly diagnosed with cervical spondylosis with degenerative disc disease, annular tear of the intervertebral disk without myelopathy in the cervical spine, neck pain and variants of migraine. (Tr. 302.)

In early 1998, Nees began a long treating relationship with Martin M. Klos, M.D., seeking medication and other assistance to help control the pain. (Tr. 405.) On March 29, 2001,[2] Nees reported that she was suffering from continuous pain in her upper body at a level of seven out of ten (ten being pain as bad as you can imagine) but that her medications and "smokin" helped ease the pain. (Tr. 318.) She was having pain at the same level in her low back, shoulders and head and down her leg on June 28, 2001. Nees was treating with Oxycodone and Marinol but was not benefitting from the medications. (Tr. 315.) By October 2001, her pain had increased to an average of eight on the pain scale and she reported she was treating with Oxycodone and marijuana without much relief. (Tr. 312.)

Nees complained to Howard Stein, D.O. of back pain in the fall of 2001. Dr. Stein noted tenderness on the left lumbosacral region, a positive straight leg raise on the left but no pain when lifting both legs simultaneously. Nees was slightly hyperreflexive on the left with questionable myoclonus of the left side and a significantly decreased sensation to temperature. The results of the exam suggested a nerve impingement and Dr. Stein recommended an MRI. (Tr. 216.) The MRI revealed desiccation of the L3-4 and L4-5 disks, but no herniations or nerve impairment. Dr. Stein recommended physical therapy and continued pain management with Dr. Klos. (Tr. 215.)

On April 9, 2002, Nees reported that she had started attending school and that she suffered from severe headaches in addition to neck, shoulder, low back and buttock pain at an eight average. Dr. Klos felt that Nees was suffering from tension headaches related to school and recommended relaxation techniques, massage, hot tub and yoga. He also added Methadone to Oxycodone and

---

[2]The first medical record from Dr. Klos the administrative record is a patient comfort assessment guide completed by Nees on February 29, 2001. Dr. Klos did not see Nees at that time because she did not have the money for the appointment.

marijuana as a treatment option. (Tr. 307-08.) Dr. Klos reported that Nees was coping well with school and was studying massage therapy and pre-law. Her range of motion in her neck and back were normal except some problems with flexion in her back. Her strength was a five out of five and she attributed her stiffness to a lack of activity the day before. (Tr. 304.)

Dr. Klos initiated a slow increase in the Methadone dosage to provide smoother control of Nees's head, neck, arm, hip and low-back pain on January 15, 2003. Nees had normal muscle strength in all areas and normal range of motion with only a decrease in her flexion. Steroid injections were not helpful and, in the absence of insurance, Nees could not afford the cost of an implantable spinal stimulator, which was the only other option recommended. Dr. Klos noted that once Nees finished school and got a job, she may have insurance to cover the cost of the procedure. (Tr. 302.) Two months later, Dr. Klos limited Nees's use of Methadone to primarily at night in the hope of helping Nees with her reported sleep problems. Nees reported that her average pain of eight was lessened to a six with medication, that her headaches were getting worse and that she experienced numbness in her hands and arms in the morning. (Tr. 298-99.)

In the summer of 2003, Nees reported that she was doing well at school taking anatomy and physiology classes as well as Native American languages. Her pain level and complaints were unchanged with the exception of the number of headaches and a feeling of being tired. Dr. Klos noted that Nees's medication usage was stable and that she had increased her function dramatically over the previous year. (Tr. 295-94.)

On September 24, 2003, Dr. Klos noted in a form provided by Lane Community College ("LCC") that Nees had difficulty walking based on the headaches and numbness and weakness in her legs and back caused by her cervical disc problems. Dr. Klos did not indicate that

accommodations were required to allow Nees to attend classes at this time. (Tr. 153-54.) Around

the same time, Cynthia Voegel, FNP-C, discussed Nees's irritable bowel syndrome in a similar form.

Voegel explained that the discomfort resulting from the syndrome may interfere with Nees's

learning but that the symptoms should improve with treatment and stress management. She also did

not indicate that accommodations were necessary to allow Nees to further her education at the LCC.

Later that year, Nees reported that she was doing well with her accommodations at school

(ergonomic chair, extra breaks) and that she was studying to apply for the dental assistant program.

She had added Tylenol and Aleve to her medications to make the Oxycodone and Methadone last

longer. (Tr. 290, 294.)

On January 20, 2004, Dr. Klos noted that Nees complained of short bouts of dizziness in the

morning when she wakes but that she was stable and was functioning very well overall and should

continue attending school. Nees's strength was normal in all areas but she had a minor decrease in

the range of motion in her neck. (Tr. 284-85.) By April, 2004, Nees had become involved in an

exercise class. She had pushed too hard the first day and was laid up for several days after. Dr. Klos

encouraged her to continue the exercise classes but slow down a bit. When Nees reported missing

multiple classes due to medical challenges, Dr. Klos encouraged her to continue her schooling as

well. Nees's average pain had decreased to a six/seven. (Tr. 278-79.)

By June 29, 2004, Nees's average pain had decreased to a six with 70-80% of her pain

controlled with medication. Nees had been camping, was enjoying the outdoors more and was more

active overall. (Tr. 272.) Dr. Klos indicated that Nees was "[d]oing well this summer after school

started. She had remained in good shape and has continued to function well at home." (Tr. 273.)

In the Fall of 2004, Nees reported that she was back in school and doing well. She indicated that she

Page -7- FINDINGS AND RECOMMENDATION                                    {SIB}

had switched from massage therapy to office work and would be looking for an office assistant job when she finished school. Dr. Klos's overall impression was that Nees was benefitting from opioid therapy and that the pain relief was clinically significant. (Tr. 266-67.)

Nees began working in school two days a week in early 2005. She was continuing her studies as a medical office assistant and was doing well both at home and in school, however, her reported average pain increased to a seven and a half. (Tr. 259-62.) X-rays of Nees's cervical and lumbar spine taken on January 24, 2005, were unremarkable. The alignment was anatomic; no fracture or subluxation was seen; the disc spaces were maintained; posterior elements were intact, no abnormalities were seen at the atlantoaxial region or in the scaroiliac joints and other bones; and there was no focal swelling. (Tr. 160-61.)

Nees was examined by Peter Horner, M.D., on February 5, 2005. Nees reported that Dr. Klos had limited her to lifting light weights only and changing positions every 15-20 minutes. She stated that she dropped objects due to numbness and weakness in both arms, that she could walk approximately one block before stopping due to hip pain and that her baseline pain level was at a six to seven out ten. (Tr. 162.) Dr. Horner performed range of motion, motor strength, muscle bulk and tone, sensory, and deep tendon reflex tests, and diagnosed her with neck and back pain, explaining that:

> This is most likely secondary to traumatic and degenerative changes due to prior motor vehicle accident. She apparently has no surgical options. She does appear to be appropriately prescribed pain medications as far as I can tell from today's encounter. This back and neck pain does appear to limit her on some housework duties and causing her to drop things. However, her sensory exam is mildly limited to touch sensation only in the left lateral forearm and left hand. Other sensory modalities were intact. The only other significant objective finding on today's examination was decreased dorsolumbar flexion.

(Tr. 164-65.)  He then opined that Nees was unlimited in her ability to stand, walk or sit during an eight hour day provided she was allowed frequent breaks or changes in position.  She was also unlimited in her ability to lift or carry based on the absence of any strength or range of motion impairments. Dr. Horner indicated that Nees was limited in her ability to engage in frequent bending maneuvers.  (Tr. 165.)

Nees complained to Dr. Klos of headaches, abdominal pain and frequent bouts of pneumonia. on February 16, 2005.  Her average pain level had increased to an eight but she was still doing well at home and at school.  On March 6, 2005, and then again on March 7, 2005, Nees was treated at Sacred Heart Hospital in Eugene, Oregon, for extreme abdominal pain and vomiting.  John Allcott, M.D., determined that Nees was not suffering from irritable bowel syndrome but rather side effects of opioid use or the withdrawal therefrom (Methadone and Oxycodone) and encouraged Nees to continue to transition off the opioids with help from Dr. Klos.  (Tr. 169.)  On March 16, 2005, Nees reported to Dr. Klos that she was feeling better after her hospitalization.  Her average pain level had decreased to a six and she planned to start school again at the end of the month.  (Tr. 252.)  The next month, Nees continued to do well and was hoping to return to work at a union hall that summer.  (Tr. 249.)  Nees obtained medical excuses for not attending classes a total of ten days from January to April, 2005, due to pneumonia, a sinus infection and "her illness and its treatment."  (Tr. 150-51.)

On April 29, 2005, J. Scott Pritchard, D.O., reviewed Nees's medical records and diagnosed her with c-spine annular tear/spondylosis with a slight disc dessication at L3-4 and L4-5, but found that Nees was not disabled at that time.  (Tr. 23, 221.)  He concluded that Nees retained the ability to lift twenty pounds occasionally and ten pounds frequently; stand, walk and/or sit about six hours in an eight-hour workday with normal breaks; frequently climb ramps and stairs, balance, stoop,

kneel, and crouch and occasionally climb ladders, ropes and scaffolds and crawl. He considered Nees to be limited in her ability to reach in all directions, including overhead and unlimited in her ability to handle, finger, feel, and push and/or pull with her hand or feet. (Tr. 222-24.) Dr. Pritchard acknowledged that Nees had complained of irritable bowel syndrome for nearly ten years and had missed school as a result of vomiting, diarrhea and constipation but did not consider the condition to support additional functional impact. (Tr. 228.)

In May 2005, Nees reported that she had begun applying for jobs. At that time, Dr. Klos indicated that her pain control was stable. She had full strength in all areas and her the range of motion in her neck was good in all directions. (Tr. 246-47.) Nees changed her mind in June 2005 and decided to return to school to retake a course she had flunked the previous semester rather than return to work. However, the pain in her head, shoulder, neck, arm and low back remained at an average of six. (Tr. 243.) In July 2005, Nees was treated by Stephan Ames, M.D., for what he described as cluster headaches. He acknowledged that Nees was currently on narcotic pain medications and then prescribed Indocin and high doses of oxygen. (Tr. 375.)

In August 2005, Nees injured her hip while doing pilates. Dr. Ames diagnosed a hip strain and prescribed Flexeril on August 11, 2005. On August 24, 2005, Nees advised Dr. Klos that she was having difficulty recovering from the hip injury because the prescribed medication made her sick and she had stopped taking it. Dr. Klos reported that Nees was functional at home and encouraged her to continue with her pilates after she reported that the activity improved her energy. (Tr. 240.) He later noted that Nees was doing very well overall during the summer and was ready to go back to school. She planned to attend school in the Spring, Summer, and Fall terms and skip the Winter term. (Tr. 237-38.)

In October 2005, Nees reported that she was back in school, that her hip was feeling better and that she was doing "OK" at school and well at home. She was still taking medical office assistant classes but was planning to transfer to the University of Oregon anthropology program to achieve her new goal of being an archeologist for the government. Nees was continuing her pilates and was able to adequately treat her really bad headaches with the medication. Her average pain had lessened to a six. (Tr. 235.)

Nees complained to Dr. Klos about her weight gain caused by her thyroid medication in November, 2005. Her pain control had decreased slightly due to increased stiffness (her average pain level was a seven) caused by the cold weather but she had moved up to more advanced pilates exercises. (Tr. 361.) There were no changes the following month with the exception of a complaint about trouble breathing due to asthma. (Tr. 358.)

On January 5, 2006, Nees sought treatment from Dr. Ames for back pain, intermittent pain down both legs, and nausea and vomiting caused by her over medicating with Oxycodone and Methadone in an attempt to lessen the pain. Dr. Ames noted normal strength and negative straight leg raise with tenderness of the low back and decreased range of motion. He prescribed Phenergan for the nausea and Flexeril and stretching exercises for the back pain. (Tr. 372.) On January 11, 2006, Nees informed Dr. Klos of her increase in pain. She thought it is was the result of her pulling her back while doing pilates in November. She described the pain as a "bunch of bee stings" in her back and legs and thought that the nerve block from 1986 may have "come undone." (Tr. 355.) Her average pain level increased to nine and she was a lot less functional at home. She was able to sleep only two hours at a time and felt like her left leg was starting to drag a little. Dr. Klos diagnosed a probable disc herniation at L4-5 and recommended bed rest and Medrol. (Tr. 356.)

Nees's average pain level had decreased to a seven by February 8, 2006. At that time, she was stable with her functions at home. She had been diagnosed with a staph infection on her face and her pain flared up with the increased inflammation caused by the infection but that was calming down. (Tr. at 352-53.) Over the next two months, Nees suffered from infections, nausea, diarrhea, and abdominal pain unrelated to her neck and back problems. Her average pain level remained between six and seven. (Tr. 349, 346.)

On March 8, 2006, Nees expressed an interest in returning to work "because of all the bills and the difficulty getting by." (Tr. 350.) Dr. Klos indicated that Nees was stable and "could answer phones, etc., but that her pain episodes are disruptive to a workplace situation." (Tr. 350.) In May 2006, Nees's average pain level increased to an eight. She reported increased "Charlie horse type pain" in her legs and dragging of the left leg which started while she was doing pilates. (Tr. 343.) Dr. Klos thought that she was showing signs of a worsened annular tear in the lumbar spine and recommended an increase in her glucosamine/msm mixture. (Tr. 344.)

On May 22, 2006, Nees discussed her neck and back pain with Dr. Ames. Upon examination, he noted that her low back area was tender but she had good range of motion with no palpable spasm. He indicated that she had decreased strength in her left leg but a negative straight leg raise in that same leg and questioned how much of the decrease in strength was psychological. He prescribed Prednisone. (Tr. 368-69.) A week later, Dr. Klos noted that Nees was having issues with the management of her medication and that the Prednisone was not helping with the neck pain but also indicated that Nees had remained functional at home and that she was doing fine at school. (Tr. 340-41.)

In June 2006, Nees qualified for additional accommodations to facilitate her continuing

education at LCC. Nees was allowed additional time to complete tests and quizzes, to take a break

during test/quizzes and to reschedule a test or quiz due to a disability-related absence. She was to

be provided an ergonomic/adjustable chair, a student volunteer note taker, audio-recorded class

lectures and the option to stand, stretch, walk, change physical position or leave the room during

class as necessary. (Tr. 148.) Nees ran out of pain medication before the end of the month in June

2006. She rated her average pain level at a seven but reported that she was less functional at school

and at home. She was enrolled in a 50-minute walking class and had resumed pilates. She requested

a medical excuse from Dr. Klos for missed classes explaining that she would be docked 35 points

for each absence otherwise. Dr. Klos decided to slowly increase her Methadone back up to eight per

day to help her combat her increased pain and recommended that she discuss the possibility of an

MRI and epidural steroid injections with her primary care physician. (Tr. 337-38.)

   In July, 2006, Nees reported that she had been active (walking and doing pilates eight hours

a week), was doing well overall (both at home and at school), and had been doing more camping.

(Tr. 334.) Nees's average pain score returned to a six in August 2006. Nees was continuing with

her walking and pilates, was out of school for the summer and was not working. She reported

continued numbness in her left arm but Dr. Klos explained that her strength remained good and that

her touch was normal. (Tr. 331-32.) With the exception of a report of increased stiffness due to the

cold weather, Nees's condition remained unchanged through the end of the year. On October 20,

2006, Nees noted that the pain control in her neck had been good, that she was using glucosamine

and was stretching regularly resulting in an improved range of motion. Dr. Klos indicated that she

had been active and remained functional both at home and at school. (Tr. 325-26.)

   On January 12, 2007, Nees was having difficulties with back and leg pain as the result of a

staph infection which made her ill and her inability to keep all of the pain medications down. She

was back in school and was excited that it was the last semester she needed for a transfer degree.

She was not sure if she would qualify for financial aid at the University of Oregon so was unsure of

her future plans. She reported an average pain level of six and a return to pilates. Dr. Klos indicated

that, despite all of the problems related to her infection, she remained functional and was doing well

in school. (Tr. 390-91.) The next month, Nees reported experiencing cramps in her left leg while

exercising and numb hands for three or four days after shampooing the furniture in her house. Dr.

Klos again noted that Nees remained functional and was doing good overall.  She retained good

strength in her arms despite the numbness which Dr. Klos felt was related to her cervical disk. He

suggested that she not push so hard with her arms.  (Tr. 387-88.)

> Dr. Klos forwarded a letter to Nees's attorney on March 12, 2007, in which he explained that:
>
> Ms. Carolann Nees has been a patient in my pain management clinic since January
> 9, 1998.  She was involved in an automobile accident on October 19, 1997.  At that
> time, she was treated with chiropractic manipulation and epidural injections.  A
> cervical MRI showed cervical spondylosis changes with degenerative disc disease of
> the cervical spine, annular tear of the intervert[e]bral disc without myelopathy in the
> cervical spine, and variants of migraine headaches.
>
> Ms. Nees has numbness in the arms due to her cervical disc; making it difficult to
> push or lift heavy objects. She also has difficulty sitting or standing for no more than
> 20 minutes.  I have recommended to her that she change positions every 15-20
> minutes.  Her migraine headaches cause severe pain, visual changes, nausea and
> difficulty concentrating on her tasks. Her symptoms are directly related to her injury
> causing degenerative disc disease in the cervical spine.
>
> I believe Ms. Carolann is not able to sustain work on a full-time basis, even if it is
> sedentary. Her pain spasms often prevent her from attending school, and she would
> routinely be missing 1-3 days per week of work on any job.

(Tr. 405.)

/ / / / /

## Vocational Evidence

The vocational expert attended and testified at the administrative hearing. He classified her past relevant work as heavy to very heavy unskilled work (construction worker), light to medium unskilled work (flagger), and medium semi-skilled work (truck driver). (Tr. 429.) At the hearing, the ALJ posed the following hypothetical:

> I'd like you to consider a hypothetical individual, she's now 45 years old, she has what I would describe as being a high school education plus, in that she had eight years of, she competed eight years in normal school, she completed almost all of a GED and she attended community college for several years, and work as you just described, and I'd like you to consider that this individual is unable to lift and carry more than 10 pounds frequently with an occasional 20 pound maximum, she is able to sit, stand or walk six hours each in eight, though she requires an opportunity to change position, she has limited tolerance for jarring that you might experience with riding a horse o[r] skiing * * *. She's limited for, I guess the way I would describe it is forceful or exertional repetitive upper extremity motion, so it's not necessarily just movement, but effort behind the movement, she is limited to occasional ladder climbing or scaffold use, crawling or overhead reaching.

(Tr. 430). The vocational expert testified that an individual with those limitations could not work as a construction worker, flagger or truck driver. However, they could work as a security guard, surveillance systems monitor or information clerk. (Tr. 430-32.) If additional limitations of walking or standing up to 30 minutes at a time and sitting up to an hour at a time were added, half of the security guard positions would be eliminate with no effect on the other two jobs. (Tr. 432.) The vocational expert then testified that an individual who had to lie down during the work day for an hour outside of normal break time or was absent an average of two days per week could not perform the jobs listed. He indicated that the normal tolerance for absences was an average of one day per month. (Tr. 433.)

/ / / / /

Page -15- FINDINGS AND RECOMMENDATION                                    {SIB}

## ALJ Decision

The ALJ determined that Nees suffered from cervical degenerative disc disease and possible lumbar disc disease with a history of irritable bowel syndrome, migraine headaches, and thyroid abnormality and that such impairments were severe. The ALJ found that Nees retained the:

> residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. She could sit, and stand/walk 6 hours each in an 8-hour work day, but she needed to change positions occasionally. She should not be exposed to sudden jarring. She is limited from forceful or exertional repetitive upper extremity motion. She could occasionally crawl, reach overhead, and climb ladders or scaffolds.

(Tr. 18.) The ALJ indicated that these findings were supported by Nees's reports that she went on camping and hunting trips and trips to the beach, where she engaged in light activity, and her ability to shop and do light yard work, mow and clean with assistance, and attend school part-time with some accommodations. (Tr. 20.) The ALJ then found that, while Nees could not perform the past relevant work of construction worker, flagger, and truck driver, she retained the ability to work as a security guard, information clerk and surveillance system monitor. Accordingly, the ALJ found Nees was not disabled at any time from July 10, 2004, to December 31, 2005. (Tr. 21.)

In reaching this conclusion, the ALJ acknowledged that Nees's medically determinable impairments could reasonably produce the symptoms described by Nees but felt that Nees's testimony regarding the intensity, persistence and limiting effects of the impairments was not credible. (Tr. at 18.)[3] The ALJ also discounted Dr. Klos's statement in his March 12, 2007, letter that Nees's condition would cause her to be absent from work two to three days a week because it was based on Nees's description of her symptoms and limitations, it contradicted the February 2007

---

[3]A detailed discussion of the ALJ's reasons for discounting Nees's testimony is set forth below at pages 20-21.

report from Dr. Klos that Nees was doing well overall but should avoid pushing hard with her arms, and it was written more than two years after Nees was last insured and did not speak to Nees's limitations during the relevant period. (Tr. at 19).

## STANDARD OF REVIEW

The Act provides for payment of Benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1) (2006). The burden of proof to establish a disability rests upon the claimant. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A) (2006). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A) (2006) .

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for Benefits because he or she is disabled. 20 C.F.R. § 404.1520 (2007); *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995). First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, Benefits are denied. 20 C.F.R. § 404.1520(b) (2007). Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or

mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (2007). If the claimant does not

have a severe impairment or combination of impairments, Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether

the impairment is equivalent to one of a number of listed impairments that the Commissioner

acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d)

(2007). If the impairment meets or equals one of the listed impairments, the claimant is conclusively

presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the

Commissioner proceeds to the fourth step to determine whether the impairment prevents the

claimant from performing work which the claimant has performed in the past. If the claimant is able

to perform work which he or she has performed in the past, a finding of "not disabled" is made and

Benefits are denied.  20 C.F.R. § 404.1520(f) (2007).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the

fifth and final step to determine if the claimant can perform other work in the national economy in

light of his or her age, education, and work experience.  The burden shifts to the Commissioner to

show what gainful work activities are within the claimant's capabilities. *Distasio v. Shalala*, 47 F.3d

348, 349 (9th Cir. 1995). The claimant is entitled to Benefits only if he or she is not able to perform

other work.  20 C.F.R. § 404.1520(g) (2007).

The reviewing court must affirm the Commissioner's decision if the Commissioner applied

proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C.

§ 405(g) (2006); *Batson* v. *Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004).

"Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Robbins*

v. *Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006).  It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Tylitzki* v. *Shalala,* 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins,* 466 F.3d at 882; *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). In determining a claimant's residual functioning capacity, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1 545(a)(3), 416.945(a)(3); *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). However, the reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007).

DISCUSSION

Nees's objections relate to the ALJ's refusal to find that she disabled based upon her need to lie down one hour a day during the workday and her need to regularly miss work one to three days a week. Specifically, Nees asserts that the ALJ failed to give clear and convincing reasons for rejecting her testimony about the extent of her limitations and Dr. Klos's opinion that Nees is unable

to work because she would regularly miss one to three days of work per week. Nees also contends that the ALJ rejected the vocational experts testimony that if Nees was so limited, she would not qualify for any job and would be disabled under the Act.

*1.    Nees's Testimony*

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). Once a claimant shows an underlying impairment, the ALJ may not make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883. In making credibility findings, the ALJ may consider objective medical evidence and the claimant's treatment history, including any failure to seek treatment, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284. Additionally, the ALJ may employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.*

In his opinion, the ALJ referenced Nees's testimony about her daily arm and back pain, which was exacerbated by physical tasks such as yard work, and her daily headaches, which she treated with frequent naps. He also acknowledged that Nees suffered from constipation, diarrhea, daily nausea and frequent vomiting. The ALJ specifically noted that Nees thought that she could lift about 8 pounds, stand 20-30 minutes at a time and sit for an hour or two but that she needed to recline an hour a day because of pain. The ALJ then explained:

After considering the evidence of record, the undersigned finds that the claimant's

medically determinable impairments could have been reasonably expected to produce
some of the alleged symptoms, but the claimant's statement concerning the intensity,
persistence and limiting effects of these symptoms are not entirely credible.

(Tr. 18.)

In support of his decision to discount Nees's testimony in this area, the ALJ also noted that
while Nees consistently reported chronic, severe pain and extremity weakness, Nees regularly
reported that she was functioning well in school and at home and the medical examinations
performed by her treating physicians were commonly normal with minor range of motion limitations.
Additionally, the ALJ explained that the limitations described by Nees were not supported by her
daily activities, which included her attending school part-time and maintaining a "B" average,
enjoying camping and hunting trips, and her ability to engage in light yard and house work and
shopping. Finally, the ALJ referred to Nees's testimony that 70% of her pain was controlled by her
pain management program.

Even though the ALJ does not discuss the reasons for discrediting Nees's testimony in the
neatly structured form that courts prefer, nevertheless, the discussion and findings required to make
a negative credibility finding are present in the opinion. The opinion of an ALJ need not be flawless
and should be affirmed where it is clear that the ALJ considered all of the relevant factors. "An
arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an
administrative finding where . . . the deficiency probably had no practical effect on the outcome of
the case." *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)(quoting *Benskin v. Bowen*, 830 F.3d
878, 883 (8th Cir. 1987)). Based on the ALJ's analysis of the relevant factors, the court finds that the
ALJ offered sufficient reasons, which were supported by the evidence in the record, for not fully
crediting the extreme limitations described by Nees in her testimony.

This holding is in line with *Orteza*, in which the Ninth Circuit held that the ALJ's specific findings in support of his determination that the claimant could perform light work adequately supported his decision to discredit the claimant's complaints of pain and fatigue. The specific findings included the lack of objective evidence to support the claimant's complaints, the claimant's statements in his initial application that he could perform "various household chores such as cooking, doing the dishes, going to the store, visiting relatives and driving," and the fact that the claimant did not take prescription pain medication or suffer side effects from the prescription drugs he did take. *Orteza*, 50 F.3d at 750. The Ninth Circuit explained that "[a]n ALJ is clearly allowed to consider the ability to perform household chores, the lack of side effects from prescribed medications, and the unexplained absence of treatment for excessive pain" when deciding whether to fully credit a claimant's testimony regarding his limitations. *Id.*

2. *Dr. Klos's Opinion*

An ALJ must generally accord greater weight to a treating physician's opinion than an examining physician's opinion and, in turn, accord greater weight to an examining physician's opinion than to a reviewing physician's opinion. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ must give specific, legitimate reasons supported by substantial evidence for rejecting a controverted opinion from a treating or examining physician. *Id.* If the opinion is not contradicted by another physician, then the ALJ may reject it only for clear and convincing reasons. *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002). An ALJ may reject portions of a physician's opinion predicated upon reports of a claimant deemed not credible. *Ryan v. Astrue*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008), *Tonapetyan v. Halter*, 80 F.3d 1148, 1149 (9th Cir. 2002).

On two occasions Dr. Klos opined on Nees' ability to work, but both opinions were outside

the relevant period of July 15, 2004 to December 31, 2005. The first was when Nees expressed her desire and intent to return to work in March 2006. At that time, Dr. Klos indicated that Nees was stable and could answer phones but that her pain episodes would be disruptive in a work environment. The second was the letter dated March 12, 2007, in which he stated that Nees would not be able to work full time, even at a sedentary level, because she would routinely miss one to three days of work a week on any job.

The ALJ rejected Klos's opinion that Nees was unable to work on three grounds: 1) the assessment was based on Nees's subjective claimants; 2) Klos's examination of Nees the month before was normal and Nees reported that she was doing well and remained functional at school and at home; and 3) the comments were made in March 2007, long after Nees was last insured and do not appear to be relevant to the Nees's condition prior to December 2005.

The reasons given by the ALJ are proper and are supported by the evidence found in the administrative record. As noted above, the court has found that the ALJ properly discounted the more extreme limitations described by Nees. Dr. Klos's notes dated February 16, 2007, indicate that while Nees reported experiencing cramps in her left leg while exercising and numb hands for three or four days after shampooing the furniture in her house, Nees remained functional, retained good strength in her arms and was doing well overall. The only limitation suggested by Dr. Klos at that time was that Nees should not push so hard with her arms. The March 2007 letter does not, in any way, relate specifically to any time other than early 2007 and it contradicts the information contained in Dr. Klos's medical notes during the relevant period, from July 10, 2004, to December 31, 2005. The ALJ properly supported his decision to give Dr. Klos's March 2007 letter "scant weight." (Tr. 19.)

*{SIB}*

*3.  Vocational Expert's Testimony*

A hypothetical posed to a vocational expert "must set out *all* the limitations and restrictions of the particular claimant." *Magallanes v. Bowen*, 881 F.2d 747, 756 (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). However, this does not mean that the ALJ is required to include all restrictions mentioned in a plaintiff's medical records. Rather the ALJ must weigh the medical evidence and include all restrictions which he finds are valid. *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982). Thus, an ALJ's limitation of evidence in a hypothetical is objectionable "only if the assumed facts could not be supported by the record." *Magallanes*, 881 F.2d at 757 (quoting *Sample*, 694 F.2d at 644).

Nees argues that the hypothetical posed by the ALJ to the vocational expert was deficient in that it did not take into account Nees need to sleep for an hour or two once a week or her inability to make it to work one to three days each week. The court has found that the ALJ gave adequate reasons for rejecting these proffered limitations. Accordingly, the ALJ's failure to include these limitations in the hypothetical is supported by the record and is not error. In the absence of these extreme limitations, the vocational expert found that Nees would perform the job duties of a security guard, surveillance systems monitor or information clerk. The ALJ appropriately adopted this testimony and found that Nees was not disabled during the relevant time period.

## CONCLUSION

The Commissioner's findings on Nees's disabilities, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner should be AFFIRMED.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge

for review.  Objections, if any, are due no later than **December 16, 2008**.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

       If objections are filed, any party may file a response within fourteen days after the date the objections are filed.  Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

       DATED this 1st day of December, 2008.

                              JOHN V. ACOSTA
                        United States Magistrate Judge